Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 3; 1980, before President Judge CRUMLISH and Judges MENCER, ROGERS, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR. Judge WILKINSON, JR. did not participate.

*George D. Wenick*, Assistant Attorney General, with him *Herbert G. Zahn*, Assistant Attorney General, and *Robert W. Cunliffe*, Deputy Attorney General, for petitioner.

*John Gallagher*, Assistant Counsel, with him *James J. Kutz*, Assistant Counsel, *John B. Wilson*, Deputy Chief Counsel, and *George M. Kashi*, Chief Counsel, for respondent.

OPINION BY JUDGE CRAIG, April 7, 1981:

The Pennsylvania Department of Transportation (PennDot) here appeals from an order of the Pennsylvania Public Utility Commission (PUC) directing PennDot to prepare and submit, within six months, detailed plans and cost estimates for the reconstruction of the Matsonford Bridge in Montgomery County.

The bridge, which serves vehicular and pedestrian traffic, spans the Schuylkill River between the Borough of Conshohocken and the Borough of West Conshohocken, and crosses over tracks of the former Reading Railroad on both sides of the river. PennDot concedes that the PUC had the legal power to order it to prepare the plans and estimates, and to reconstruct the bridge, by force of Section 409(c) of the former Public

Utility Law,[1] but PennDot contests the *time limitation* imposed by the PUC order for the submission of the *plans and estimates.*

In September 1972, PennDot had filed a complaint with the PUC alleging that the Matsonford Bridge was in a serious state of disrepair, that PennDot had prepared a plan for its repair, and that such repair was necessary to insure the life of the bridge.

In January 1974, after investigation and hearing, the PUC issued an order approving PennDot's repair plan, directing that PennDot make the repairs at its own initial cost and expense, and that a further hearing be held regarding cost allocation and future maintenance responsibilities. Included among the several other parties to the proceeding was the Borough of Conshohocken.[2]

In December 1974, PennDot petitioned the PUC to modify its order. In that petition PennDot asserted that repair of the bridge was not economically feasible and that the bridge had to be reconstructed, as a new bridge to be built at the same location. After further hearing the PUC issued a new order, on October 21, 1975, approving the petition for modification. The modified order directed PennDot to submit to the PUC and the other parties, within twelve months, detailed plans and cost estimates for the reconstruction of the Matsonford Bridge.

By November 12, 1976, PennDot had not submitted plans and estimates as directed by the modified order. On that date the Borough of Conshohocken

---

[1] Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §1179(c), now Section 2702(c) of the Public Utility Code, 66 Pa. C. S. §2702(c).

[2] Other parties respondent were the Borough of West Conshohocken, the County of Montgomery, the Trustees of the Reading Company, the Bell Telephone Company, and the Philadelphia Suburban Water Company.

petitioned the PUC to enforce the mandate. According to the Borough, the bridge was in such a state of disrepair as to endanger the public. In the wake of the Borough's action, PennDot filed another petition of its own, on December 1, 1976, this time seeking a time extension to comply with the order of October 21, 1975. In that petition PennDot represented that its financial situation prevented it from completing the plans and estimates for reconstruction, and PennDot requested that the deadline set in the order of October 21, 1975, be extended to a time twelve months from *legislative approval* of funds for the entire reconstruction project.

In October 1977, an Administrative Law Judge entered an Initial Decision rejecting PennDot's contention that compliance with the PUC order had to await legislative approval, directing PennDot to repair the bridge surface within sixty days, and to complete and submit at its own cost, within six months of the Decision, the detailed plans and estimates. In January 1978, the PUC entered an order adopting the decision of the Administrative Law Judge; from that order PennDot has appealed to this Court.

Although PennDot itself thus was the originator of the petition to reconstruct the bridge, nevertheless PennDot now asserts that there is an independent legal impediment to full compliance as to plans and estimates within the six months specified by the order here in issue.

PennDot argues that reconstruction of the bridge is a "capital project" as defined by Section 2(1) of the Capital Facilities Debt Enabling Act (Debt Enabling Act)[3] and that, therefore, legislative approval is required to expend funds even for the plans and cost

---

[3] Act of July 20, 1968, P.L. 550, *as amended*, 72 P.S. §3920.2(1).

estimates. From that contention, PennDot further argues that the need for legislative approval prevents compliance with the PUC order within the six months mandated.

On the other hand, the PUC claims that PUC projects, such as this reconstruction of the Matsonford Bridge, are not "capital projects" within the compass of the Debt Enabling Act and thus no legislative approval is required.

In order to narrow our inquiry to the key issue, we conclude, at the outset, that PennDot is correct in contending that:

1. A 'capital project', if it is to be financed by debt incurred without voter approval, must be specifically itemized in a capital budget. Pa. Const. art. VIII, §7(a)(4)

2. The reconstruction cost of the Matsonford Bridge, if it were to be debt-financed under the above constitutional provision, is a 'capital project' in that it involves the construction of a 'structure, facility or physical public betterment or improvement' having 'an estimated useful use in excess of five years and an estimated financial cost in excess of one hundred thousand dollars ($100,000)'. Section 2(1) of the Debt Enabling Act, 72 P.S. §3920.2(1)

3. Even if the bridge reconstruction were to be financed, not from debt without voter approval, but from other debt or from operating funds, the governor has a duty to identify such a project in the capital budget for the fiscal years in which such capital project expenditures are proposed. Pa. Const. art. VIII, §12; Section 613 of the Administrative Code[4]

---

[4] Section 613 of the Act of April 9, 1929, P.L. 177, *as amended*, added by Section of the Act of September 27, 1978, P.L. 775, 71 P.S. §233.

However, the contested order here does not mandate the Matsonford Bridge reconstruction itself; it mandates only the completion of plans and estimates in preparation for that project, at a planning cost of approximately $75,000, such plans being, according to PennDot, already 50% complete.

Therefore the pivotal issue is whether the expense of the plans and estimates ordered by the PUC *must* be treated as a capital project expenditure under the statutory and constitutional requirements on which PennDot relies for delay.

PennDot has not presented any authority to support the essential premise — that the plan-making cost must be treated as a capital project expenditure which cannot be made without specific legislative authorization — other than a reference to Section 2(6) of the Debt Enabling Act,[5] which includes preliminary planning costs within the definition of the "financial cost" of a "capital project". However, that act relates only to the authorization of debt financing and therefore does not amount to a requirement that planning costs be treated as inseparable from the construction costs, at least where the planning costs might be financed by sources other than debt.

We cannot read the effect of that definition as doing more than *authorizing* planning expenses to be treated as capital costs for the purpose of debt financing; the act contains no words *mandating* that such expense shall be *always* so treated.

Our interpretation of Section 2(6) is illustratively confirmed by the fact that its definition of "financial cost" also includes personnel salaries incurred in planning a capital project. Although the act thus permits such operating costs to be debt-financed as a "financial cost" of a "capital project" when so related, to read

---

[5] 72 P.S. §3920.2(6).

the section as mandating that such salary expenses shall always be classed as capital project matters, so as to require advance legislative approval before any PennDot engineer could be devoted to construction plans for a possible project, would of course be ludicrous.

In addition, the Governor's Administrative Code duty, noted above, to include capital project expenditures in his capital budget, even if financed from operating funds, does not speak to the question of whether the planning costs must necessarily be treated as part of the "capital project" for that budgeting requirement.

Therefore, the preparation of plans and estimates does not involve expenditures which must await full capital project budgeting and legislative authorization of the specific project; the design funding here need only be made out of a lawful budgetary source like any other ongoing expense of PennDot. To treat design study costs otherwise would surely hamstring PennDot seriously hereafter, requiring it to have itemized legislative approval before proceeding even to engage in any planning for a crucial future project, whether or not ordered by the PUC. To require specific legislative approval before preparing any design studies, themselves often necessary to provide a basis for legislative consideration of the capital project, would be putting the cart before the horse, and we do not perceive that the wording of the law requires that to be done.

Accordingly, we affirm the order of the PUC.

ORDER

AND Now, this 7th day of April, 1981, the order of the Pennsylvania Public Utility Commission at its Complaint Docket No. 19707, adopted November 22, 1977 and entered January 9, 1978, is hereby affirmed.

312

This decision was reached before the expiration of the term of office of Judge WILKINSON, JR.

————

DISSENTING OPINION BY JUDGE WILLIAMS, JR.:

I substantially agree with the factual history as set forth in the majority opinion. I do, however, respectfully dissent from the majority's legal conclusion.

Section 2(1) of the Debt Enabling Act provides in pertinent part that:

'Capital project' *means and includes* (i) any building, structure, facility, or physical public betterment or improvement; ... or (iv) any undertaking to construct, repair, renovate, improve ... any of the foregoing, provided that the project is designated in a capital budget as a capital project, has an estimated useful life in excess of five years and an estimated financial cost in excess of one hundred thousand dollars ($100,000); ... *and shall include* projects to be financed by the incurring of debt, such projects being separated into the following categories:

'Community College Projects' ....
'Highway Projects' ....
'Flood Control Projects' ....
'PIDA Projects' ....
'Redevelopment Assistance Projects' ....
'Site Development Projects' ....
'Public Improvement Projects' ....
'Transportation Assistance Projects' ....
'Other Capital Projects' .... (Emphasis added.)

Structurally, Section 2(1) of the Debt Enabling Act can be viewed as having two "levels." The first level contains the *generic* characteristics of a "capital project," those characteristics being delineated in Sections

2(1)(i) through 2(1)(iv), and including part of the proviso in 2(1)(iv). On the second level, Section 2(1) enumerates nine classes of debt-financed projects which are put within the meaning of "capital project" by *specific inclusion*.

The question of whether the reconstruction of the Matsonford Bridge is itself a "capital project" within the terms of the Debt Enabling Act is one of constitutional significance. For, the Debt Enabling Act is an implementation of Article VIII, Section 7(a), clause (4), of the Pennsylvania Constitution, and gives definition to the term "capital project" contained in that constitutional provision. Section 7(a) declares that no debt shall be incurred by or on behalf of the Commonwealth except by law and in accordance with the provisions of that Section of the Constitution. Clause (4) of Section 7(a) provides, in pertinent part, as follows:

> Debt may be incurred without the approval of the electors for *capital projects specifically itemized in a capital budget* if such debt will not cause the amount of all net debt outstanding to exceed one and three-quarters times the average of the annual tax revenues deposited....
> (Emphasis added.)

The above constitutional clause is a grant of power to the state government to incur debt for "capital projects" without voter approval, if the project is itemized in a capital budget and satisfies the other criteria of the clause. Therefore, if a given project *is* a "capital project" as defined by the implementing Debt Enabling Act, then the project must, among other requirements, be one that is itemized in a capital budget, if it is to be constitutionally debt financed *without* voter approval.

Regarding the reconstruction of the Matsonford Bridge, it is clear that the project represents an under-

taking to construct or renovate a structure, facility or physical public improvement. The estimated useful life of the reconstructed bridge exceeds five years. And, there is no dispute that the *reconstruction project* will exceed $100,000.00 in financial cost. According to PennDot's undisputed estimate, the cost of the entire project will exceed $5,000,000.00. The bridge reconstruction project itself meets all the requirements of a "capital project" under Sections 2(1)(iv) of the Debt Enabling Act, except for one: the bridge project was never designated as a "capital project" in any capital budget.

It is another striking feature of this case that after PennDot apparently submitted the reconstruction project to the State Transportation Commission, the Commission never included the project in any capital program it submitted. As a result, the project was never designated or itemized in any capital budget sent to the General Assembly.

However, it is my conclusion that the project for the reconstruction of the bridge did not lose its characteristics as a "capital project" because of the failure of the Transportation Commission to include it in a capital program or because of the failure to designate the project in a capital budget. In my view, the additional requirement in Section 2(1)(iv) of the Debt Enabling Act that a project be one designated as a "capital project" in a capital budget, is not intended to describe one of the generic characteristics of a "capital project." Rather, that part of the proviso in Section 2(1)(iv) sets forth one of the procedural requirements that must be satisfied before what is *otherwise* a "capital project" may be constitutionally debt financed without approval of the electors. Indeed, the above part of Section 2(1)(iv) of the Debt Enabling Act, which speaks of a project "designated in a capital budget as a capital project," is no more than a repeti-

tion of the constitutional requirement of Article VIII, Section 7(a), clause (4), that a "capital project" be specifically itemized in a capital budget, as one of the conditions for the debt financing of a "capital project" without the approval of the electors. In other words, the *subject* of the itemization requirement is a project which is in kind a "capital project."

For purposes of the case at bar, the applicability of the Debt Enabling Act means that the bridge reconstruction must be included as a capital project in a capital budget if the reconstruction is to be financed by *incurring debt without voter approval.* However, if the bridge project is to be financed by other means, then Article VIII, Section 12, of the Pennsylvania Constitution is of great significance. In pertinent part, that constitutional provision declares as follows:

Annually, at the times set by law, the Governor shall submit to the General Assembly:

(a) ....

(b) A capital budget for the ensuing fiscal year setting forth in detail proposed expenditures to be financed *from the proceeds of obligations* of the Commonwealth or of its agencies or authorities *or from operating funds*; and

(c) A financial plan for not less than the next succeeding five fiscal years, which plan shall include for each such fiscal year:

(i) *Projected operating expenditures classified by department of agency and by program*, in reasonable detail....

(ii) *Projected expenditures for capital projects specifically itemized* by purpose, and the proposed sources of financing each. (Emphasis added.)

Article VIII, Section 12, of the Constitution was implemented by Act No. 149 of September 27, 1978.

In pertinent part, Section 3 of Act No. 149 provides as follows:[1]

As soon as possible after the organization of the General Assembly ... the Governor shall submit to the General Assembly copies of agency budget requests and a State budget and program and financial plan embracing:

(2) A capital budget for the ensuing fiscal year setting forth capital projects to be *financed from the proceeds of obligations* of the Commonwealth or of its agencies or authorities or from *operating funds*.

(3) A program and financial plan for not less than the prior fiscal year, the current fiscal year, this budget year and the four succeeding fiscal years, which plan shall include for each such fiscal year:

(i) Actual or estimated operating expenditures classified by department or agency and by program, in reasonable detail.... (Emphasis added.)

It must be concluded from Article VIII, Section 12, of the Pennsylvania Constitution and its implementing legislation that the reconstruction of the Matsonford Bridge could not be financed from either *the proceeds of obligations or from operating funds* unless the project is contained in a capital budget or designated as the subject of operating expenditures in a financial plan, as required by Act No. 149.

I am mindful of the legal power vested in the PUC by Section 409 of the Public Utility Law and related statutory provisions. I recognize that the PUC has the statutory power to order PennDot to reconstruct the bridge. However, I must reject the contention of the PUC in this appeal, and the conclusion of the Ad-

---

[1] Act of September 27, 1978, P.L. 775, 71 P.S. §233.

ministrative Law Judge below, that projects ordered by the PUC are not within the compass of the Debt Enabling Act. The statutes conferring powers upon the PUC are subordinate to the relevant fiscal provisions of the Pennsylvania Constitution and implementing statutes. Although the PUC may validly *order* a given project, the funds for it must be provided in accordance with constitutional mandates.

I am not suggesting that either PennDot or the Transportation Commission can nullify a project validly ordered by the PUC, by failing to have the project included in a capital program or capital budget. What I conclude is that the judicial enforcement of such an order must be in terms of constitutional fiscal requirements. In short, this Court can and will order PennDot to submit a budget request so that the total project may be placed before the General Assembly.

There remains the question of whether PennDot's completion of the detailed plans and cost estimates as ordered below have to await legislative approval. Put differently, the issue is whether PennDot *may* expend funds and bear the cost of preparing the plans and estimates without having such an expenditure, or the reconstruction project itself, itemized in a budget or financial plan approved by the legislature.

The cost of preparing the plans and estimates was put at $75,000.00. The PUC asserts that because the cost is less than the $100,000.00 threshold amount set forth in Section 2(1) of the Debt Enabling Act, the preparation of the plans and estimates does come within the definition of a "capital project" as to require legislative approval. PennDot, to the contrary, argues that the plans and estimates cannot be divorced from the entire reconstruction project. In contending that legislative approval is required to expend funds even for the plans and estimates, appellant PennDot first points to Section 2(6) of the Debt Enabling Act.

That Section declares, *inter alia*, that the expense of preparing *plans and estimates* for a "capital project" is a part of the "financial cost" of the project. That provision readily induces the idea that if a given "financial cost" requires legislative approval then all the elements of that cost also require legislative approval.

However, the Debt Enabling Act is concerned with the incurring of debt. Of more pervasive significance is Act No. 149: By force of Act No. 149, expenditures for capital projects from the proceeds of obligations *or expenditures from operating funds* are both items that must have been set forth in a budget submitted to the legislature by the Governor.[2] Therefore, I conclude that even the expenditure of *operating funds* to prepare the plans and cost estimates here in question would require legislative approval. Even if the preparation of the plans and estimates could be viewed as separate from the project itself, the expenditure of funds for the plans and estimates would remain subject to fiscal requirements that have not been satisfied in this case. Thus, our enforcement of the PUC order for those plans and estimates must be tailored in terms of the constitutional provisions governing the expenditure of funds and the statutes that implement those provisions. The majority's decision in this case would empower the PUC to dictate the expenditure of public funds without regard for constitutionally mandated fiscal procedures.

---

[2] Perhaps one of the policy considerations underlying such a requirement, at least so far as operating funds are concerned, is the idea that substantial funds should not be expended for the initial stages of capital projects which may not be approved.